No. 55,938

KANSAS ELECTRIC POWER COOPERATIVE, INC., a Corporation, *Plaintiff-Appellee,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS: R. C. "PETE" LOUX; JANE ROY; and PHILLIP R. DICK, COMMISSIONERS, and their respective successors in office as members of the State Corporation Commission of the State of Kansas, *Defendants-Appellants.*

(683 P.2d 1235)

Opinion filed June 8, 1984.

*Terence L. Mundorf,* of Williams, Novack & Hansen Law Firm, of Everett, Washington, argued the cause, and *Brian J. Moline,* general counsel, of State Corporation Commission, was with him on the briefs for the appellants-cross-appellees.

*James M. Caplinger,* of James M. Caplinger, Chartered, of Topeka, argued the cause and was on the brief for the cross-appellees, Kaw Valley Electric Cooperative Company, Inc., and Nemaha-Marshall Electric Cooperative Association, Inc.

*John Philip Kassebaum,* of Kassebaum & Johnson, of Wichita, argued the cause, and *Clifford L. Bertholf,* of the same firm, was with him on the briefs for the appellee-cross-appellant.

The opinion of the court was delivered by

PRAGER, J.: This case involves a judicial review of orders of the state corporation commission (KCC) granting the Kansas Electric Power Cooperative, Inc. (KEPCo) a limited certificate of convenience and authority to transact business in this state as a public utility. In the same proceeding, KEPCo also requested authority to purchase an undivided 17% interest in the Wolf Creek Generating Station, a nuclear power plant then being constructed by Kansas Gas and Electric (KG&E) and Kansas City Power and Light Company (KCP&L). The KCC granted authority for the sale of the undivided 17% interest in the Wolf Creek plant to KEPCo. It also granted KEPCo a limited certificate of convenience subject to certain conditions over the strong objections of KEPCo.

The procedural history of the case is essentially as follows: KEPCo filed its application with the KCC for a limited certificate of convenience on October 13, 1979, along with its application to purchase an undivided 17% interest in the Wolf Creek Station. On June 9, 1980, the matter came on for hearing before the KCC. Eighteen days of hearings were conducted and, on August 11, 1980, the record was closed and the matter was taken under advisement upon the submission of briefs by the parties. On October 22, 1980, the KCC issued its order granting KEPCo a limited certificate of convenience and authority to do business as an electric utility in the State of Kansas and to purchase an undivided 17% interest in the Wolf Creek generating station. The KCC also authorized KG&E and KCP&L to sell to KEPCo an undivided 17% ownership interest in the Wolf Creek station.

The certificate granted KEPCo by this order was subject to the following conditions:

(1) The KCC directed KEPCo to provide a wider distribution. of "hydro peaking power" which was to be purchased by KEPCo through the Southwestern Power Administration of the Department of Energy.

(2) The KCC required the separation of KEPCo from its close relationship with Kansas Electric Cooperatives, Inc. (KEC) by prohibiting the same individuals from being officers and trustees of both organizations and prohibiting compensated employees of KEC from being members of the KEPCo board of trustees.

(3) The KCC required KEPCo to submit to the KCC, for its review and approval, a plan for the establishment of a sinking fund sufficient to defray KEPCo's portion of the expenses of decommissioning the Wolf Creek plant based upon the cost projections submitted by KG&E at the hearing.

(4) The KCC required KEPCo to formulate and submit to the KCC a projection of anticipated expenses for the cost of purchase of replacement power due to unscheduled outages at the Wolf Creek plant, and a plan for accruing a contingent fund sufficient to cover such expenses. A number of other conditions were imposed which are not involved in the appeal and which need not be considered.

KEPCo, KG&E, and KCP&L then perfected appeals to the district court. KG&E and KCP&L subsequently dismissed their appeals. The matter was heard before the district court, and on June 14, 1983, the trial court entered its memorandum decision and order. The district court held unlawful those portions of the KCC order (1) requiring a wider distribution of "hydro peaking" electric power than that proposed by KEPCo; (2) forbidding the same individuals from serving as officers, directors, and compensated employees of both KEC and KEPCo; (3) requiring KEPCo to submit a plan for the establishment of a sinking fund sufficient to decommission Wolf Creek at the end of its useful life; and (4) requiring KEPCo to submit proposals for the establishment of a contingency fund for the purpose of purchasing replacement power due to outages at the Wolf Creek plant. The KCC has appealed those orders of the district court holding unlawful those portions of the KCC's order just mentioned. KEPCo filed a cross-appeal contending the district court erred in

remanding the proceeding to the KCC instead of approving the certificate after vacating the conditions it had found to be unlawful.

At the outset, we should note the scope of review of an order of the KCC on appeal to the district court. The basic principles governing the scope of review are set forth in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979), as follows:

> "K.S.A. 1978 Supp. 66-118d limits judicial review of an order by the commission to determining whether the order is 'lawful' or 'reasonable.' *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, Syl. ¶ 1, 544 P.2d 1396 (1976). A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, 396-7, 565 P.2d 597 (1977). An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. 505, Syl. ¶ 1, 561 P.2d 779 (1977). An order is generally considered 'reasonable' if it is based on substantial competent evidence. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 2.
>
> "The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. at 511. Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 675, 482 P.2d 1 (1971). The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 48-9, 386 P.2d 515 (1963). Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975); *Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, Syl. ¶ 5, 527 P.2d 1065 (1974)." pp. 380-81.

The district court found, and the parties agree, that the KCC has the authority to impose lawful, reasonable conditions on the granting of a certificate of convenience. The essential questions on the appeal involve a determination of the limits imposed on the commission's power to impose such conditions and a decision as to whether the four conditions imposed exceed those limits.

The district court, in its memorandum decision, correctly stated that the limits on this power are set by the standard of review of the court. Any condition imposed must be both lawful and reasonable. To be "lawful" the condition must be within the statutory authority of the KCC and all statutory and procedural rules must be followed. A condition is "reasonable" if based upon substantial, competent evidence. With these principles in mind, we now consider each of the conditions imposed by the KCC to determine whether the condition is both lawful and reasonable.

### Condition No. 1 — Requiring a wider distribution of SPA hydro peaking power

The factual background necessary to determine the validity of this condition is set forth in the memorandum decision of the district court in the following language:

"In 1973, the Kansas Electric Cooperatives, Inc. (hereinafter referred to as 'KEC'), an organization of Kansas rural electric cooperatives, established a 'Power and Energy Department' to explore alternate power supply sources for these 'RECs.' . . . Various alternatives were examined, including equity interests in Wolf Creek and Jeffrey Energy Center, and purchase of hydro peaking power from the Southwestern Power Administration, a branch of the United States Department of Energy. . . .

"The costs incurred by KEC in its search for alternatives were assessed against the member RECs of KEC pursuant to contracts entered into between the member RECs and KEC. . . .

"In February, 1975, KEPCo was formed by incorporation and in March, 1976, it 'succeeded to the position formerly occupied by the KEC Power and Energy Committee.' . . . However, not all members of the KEC are also members of KEPCo. Certain members, such as Intervenors Kaw Valley and Nemaha-Marshall either never joined KEPCo or later withdrew from KEPCo's membership, apparently due to an unwillingness to participate in the Wolf Creek venture or to sign forty year power requirements contracts with KEPCo. It has apparently become KEPCo's policy at some point to tie access to SPA power to Wolf Creek participation and the requirements contracts. . . .

"On April 19, 1979, KEPCo entered into a contract with the United States through the Department of Energy as represented by the Administrator of the Southwestern Power Administration for the purchase of 90 megawatts of hydro peaking power. . . . On August 2, 1979, the SPA announced the allocation of 90 megawatts of hydro peaking power to the KEC in the Federal Register Volume 44, No. 150. . . .

"The Commission made the following findings based upon its review of the evidence:

"[T]hose cooperatives which seek a portion of this SPA hydro peaking power are preference customers for such power under the Flood Control Act of 1944. Further, the record shows that each of them has made a substantial financial

contribution to KEC to finance the acquisition of this power. *** It is also clear that the original allocation of this SPA power was to KEC, of which Kaw Valley and Nemaha-Marshall were and are members. *** It was a policy decision on the part of KEPCo which imposed upon distribution cooperatives seeking a share of this SPA hydro peaking power the conditions that they must participate in the acquisition of an ownership interest in the Wolf Creek plant.  .  .  .

"Because Kaw Valley and Nemaha-Marshall made 'substantial' contributions - $23,178.75 and $18,042.50 respectively  .  .  .  the Commission concluded that the public convenience and necessity would be promoted by authorizing KEPCo to purchase and resell the 90 megawatts of hydro peaking power subject to the condition that *all* Kansas distribution cooperatives who are members of KEC and who have paid assessments to KEC to support the efforts of the Power and Energy Committee be allowed, without regard to participation in Wolf Creek or Membership in KEPCo, 'a percentage of this capacity, and the contractually associated energy, which equals the percentage of KEC's summer non-coinci-dent peak load which each distribution cooperative represented in 1979.' The energy was to be made available at KEPCo's cost plus an increment to cover KEPCo's administrative and general expenses."

The district court concluded that the question of the distribution of SPA hydro peaking power involved matters which should have been excluded from consideration by the KCC in granting a certificate of convenience, because the entire SPA hydro peaking power matter is purely a contractual dispute between private corporations affected with a public interest and, thus, were outside the jurisdiction of the KCC. The trial court also noted that Kaw Valley and Nemaha-Marshall may be allowed to participate in SPA power without regard to participation in Wolf Creek and KEPCo; but, if they are so entitled, it is because the various contracts involved give them that right. This determination the trial court found to be judicial in nature. The trial court reasoned that, when the KCC ordered a reallocation of SPA power in exchange for the grant of a certificate of convenience and necessity, it, in effect, demanded the right to decide a contract dispute between KEPCo and two or more nonmember rural electric cooperatives. The trial court concluded that, in so doing, the KCC exceeded its authority, and therefore, the condition which required a wider distribution of SPA hydro peaking power was unlawful.

We have considered the issue and have concluded that the district court was correct and that Condition No. 1, involving SPA hydro peaking power, was unlawful for the reasons stated by the district court.

## Condition No. 2 — Requiring limitations on
## KEPCo's corporate organization

The KCC, as a condition to granting the certificate, prohibited the same individuals from being officers and trustees of both KEPCo and KEC and prohibited compensated employees of KEC from being members of KEPCo's board of trustees. In its memorandum decision, the district court noted that KEPCo attacked these restrictions (1) as infringements of the statutory rights conferred upon electric cooperatives and their members to elect their representatives pursuant to K.S.A. 17-4601 *et seq.;* (2) as attempts to interfere with the management of a corporation and thus outside the scope of the KCC's power, authority, and jurisdiction; and (3) as not based upon substantial competent evidence.

The trial court noted the provisions of the Electric Cooperative Act (K.S.A. 17-4601 *et seq.*) which provide that an electric cooperative must have, as officers, a president, vice-president, secretary, and treasurer who must be elected by and from the board of trustees. It noted that each trustee of an electric cooperative must be a member of the cooperative. Electric cooperatives are specifically made subject to the control and jurisdiction of the KCC (K.S.A. 17-4630). In discussing the relationship of KEPCo and KEC, the court stated as follows:

"KEPCo is a 'cooperative of cooperatives.' Its members are 26 electric cooperatives. . . . KEC is a statewide organization of 38 electric cooperatives also operating pursuant to K.S.A. 17-4601 *et seq.* . . .

"At the time of the Commission's Order, KEC and KEPCo operated under a 'shared management' approach. Each member rural electric cooperative ('REC') of KEC and each member REC of KEPCo designated a representative to the respective boards of trustees of KEC and KEPCo. Each of the two boards of trustees then designated members to form executive committees. The KEC executive committee and the KEPCo executive committee formed a 'joint advisory committee' which appointed an executive vice-president who served as the chief executive officer of *both* KEC and KEPCo. . . .

"The primary bases for the Commission's restrictions on KEPCo's organization stemmed from the potential for conflicts of interests arising out of the shared management arrangement and from the perceived need for a full-time chief executive officer for KEPCo. . . . The Commission found evidentiary support for the former concern in part in the testimony of two witnesses. The first was Fred R. Stone, General Manager of Intervenor Kaw Valley Electric Cooperative, who testified that he was asked by Charles Ross, manager of KEC, not to pursue a separate hydro peaking power allocation but to allow the KEC's Power and Energy Committee to apply for all electric cooperatives. . . . However, the Committee's successor, KEPCo, later denied Kaw Valley access to the 90

megawatt allocation due to lack of membership in KEPCo or lack of participation in Wolf Creek.

"The other witness, Lloyde H. Goins, General Manager of Intervenor Nemaha-Marshall Electric Cooperative, testified that he also felt misled by certain statements made by Mr. Ross, who was serving the dual function of chief executive officer for both KEC and KEPCo, indicating Ross was pursuing SPA power on behalf of all cooperatives. . . . Because of these occurrences and the Commission's belief that this type of conflict would recur in the future due to the divergence of goals of KEC and KEPCo, the Commission felt it would be in the public interest to completely separate the managements of the two entities. . . .

"The mere existence of a problem and a genuine concern on the Commission's part, however well founded, cannot give rise to power and jurisdiction. These arise only from legislative grant. A perceived need for action does not give the Commission the power to expand its jurisdiction beyond that grant. Nor does it give the Commission the power to override specific statutory schemes and guidelines contained in other chapters of the Kansas Statutes Annotated.

"K.S.A. 17-4630 subjects KEPCo, as an electric cooperative, to the jurisdiction and control of the Commission. K.S.A. 66-101(a) grants to the Commission 'full power, authority and jurisdiction to supervise and control' public utilities and to do all things necessary and convenient for the exercise of 'such power, authority and jurisdiction.' However, the extensive enumeration of powers of the Commission and obligations of the public utilities which follows that grant makes it clear that K.S.A. 66-101(a) was not intended as a grant of power to inquire into and restructure every facet of a cooperative's operations, particularly where other statutes exist which deal with the issue.

"K.S.A. 17-4601 et seq. contains detailed requirements, as outlined above, for the organization of the management of a cooperative. In particular, K.S.A. 17-4612(a) states that the bylaws shall prescribe the qualifications of trustees, 'other than those prescribed in this act.' Since an officer must also be a trustee (K.S.A. 17-4614), this applies also to officers. Neither K.S.A. 17-4601 et seq. nor K.S.A. 66-101 et seq. can be fairly read to prescribe the types of restrictions placed on KEPCo's management and any power somehow derived from K.S.A. 66-131 to impose such restrictions would appear to render K.S.A. 17-4612(a) somewhat meaningless.

"In effect, the Commission sought to impose upon the trustees and officers of KEPCo new and additional qualifications not to be found in either the bylaws or the Electric Cooperative Act. This is an unlawful assumption of legislative power in excess of that granted by statute to the Commission.

"In Kansas Commission on Civil Rights v. City of Topeka Street Dept., 212 Kan. 398, 511 P.2d 253 (1973), where an administrative regulation of the KCCR was harmonized with statutes controlling appeals of its decisions despite an apparent conflict, the court stated as follows:

"In the absence of valid statutory authority, an administrative agency may not, under the guise of a regulation, substitute its judgment for that of the Legislature. It may not exercise its sublegislative powers to modify, alter or enlarge the provisions of the legislative act which is being administered. 212 Kan. at 402.

"The Court is fully cognizant of the Commission's position on this issue but concludes that the Legislature, having already spoken to the issue of qualification of trustees, is the appropriate body to address the issue at this point. Since the Legislature has given to the members and trustees an authority as fundamental to the operation of a cooperative as the selection of its management, subject only to such other qualifications as may be found in the Electric Cooperative Act and the Public Utilities Act, the Commission should be required to demonstrate specific statutory authority before modifying or enlarging those qualifications."

We have considered the decision and rationale of the trial court and concluded that the trial court was correct in holding this condition to be unlawful under the circumstances. In our judgment, the condition imposed constituted an unlawful interference with the management of KEPCo. We recognize, of course, that in the future problems could arise involving improper acts of KEPCo's management because of its close relationship with KEC. In that event, and if unlawful or unreasonable conduct takes place that has an adverse effect on the services provided by KEPCo, then the KCC may consider those issues when they arise. Until that event occurs, however, the officers and members of the board of trustees of KEPCo should be permitted to conduct KEPCo's affairs, using the best leadership it can find available, including the leaders of the KEC.

## Condition No. 3 — Requiring a Decommissioning
### Sinking Fund

The KCC required KEPCo to submit to the KCC for its review and approval a plan for the establishment of a sinking fund to cover KEPCo's portion of the expenses of decommissioning the Wolf Creek plant. The district court found this portion of the KCC's order to be an unlawful invasion of the province of management of KEPCo and, therefore, beyond the authority of the KCC to impose. In considering this issue, it is important to note the fact that the administrative proceeding involved not only an application by KEPCo for a certificate of convenience and authority to act as an electric public utility, but also involved an application for authority to purchase an undivided 17% interest in the Wolf Creek generating station. In its order, the KCC set forth seven specific conditions regarding the purchase of an undivided 17% interest in the Wolf Creek plant by KEPCo. Condition No. 7 required that KEPCo submit to the KCC for its review and approval a plan for the establishment of a sinking

fund sufficient to defray KEPCo's portion of the expenses of decommissioning the Wolf Creek plant based upon the projec-. tions submitted by KG&E. In this regard, KCC in its order made certain findings of fact in regard to the problem of decommissioning a nuclear plant. Finding of fact No. 72 of the KCC, which was adopted by the trial court, stated as follows:

"72. The other issue which is peculiar to nuclear plants is that of decommissioning. When a normal fossil plant reaches the end of its useful life, it is dismantled and sold for salvage. When a nuclear plant reaches the end of its useful life, it appears that no one in the industry knows what will happen. A number of alternatives are currently under discussion. One approach is to entomb the entire plant in concrete right where it stands. A second approach is to fence it off and guard it indefinitely. A third technique that has been proposed is to decontaminate the plant, dismantle it, and ship its constituent parts to an approved site for disposal. . . . At the present time, it is impossible to say which, if any, of these three approaches will ultimately be used. The difficulty in determining what will be done with a nuclear plant at the end of its useful life is compounded by the fact that a plant the size of Wolf Creek has never been decommissioned in this country, so literally no one knows how it will be done. As the record clearly establishes, this muddle as to how the Wolf Creek plant will be decommissioned makes the task of estimating the expense of that undertaking difficult at best. There is no source, including the NRC, which can be turned to in order to obtain a reasonable and reliable estimate of the expense KEPCo ratepayers will incur in decommissioning this plant."

The KCC also adopted findings of fact No. 73 and 74 on the subject of decommissioning which provide:

"73. KEPCo addressed this issue by essentially adopting the approach taken by KG&E. KG&E maintains that approximately one-quarter of the 4.00 percent depreciation rate applied to the Wolf Creek plant represents a provision for projected decommissioning expenses. Over the course of the life of this plant, this provision will generate approximately $400,000,000 to be used for decommissioning expenses. . . . However, since these funds will be undifferentiated from other sources, they will be expended in the normal course of business. Both KEPCo and KG&E acknowledge that under this approach, at the time that the money for decommissioning is needed, each of the owners will have to borrow the funds necessary for decommissioning. . . . Naturally, such an approach will leave the utilities at the mercy of the capital market at the time they need the money, and will force them to pay the market rate which prevails at that time. This adds yet another uncertainty to the decommissioning process, on top of the uncertainties as to the amount of the expense and methodology to be used.

"74. We feel that the record before us clearly supports, and in fact mandates, action by the Commission to remove at least some of the uncertainties associated with the decommissioning process. It is the firm conviction of the Commission that the record demonstrates the necessity of the participating utilities taking positive steps now to ensure that they will have the financial wherewithal to

meet the expenses of decommissioning projected by KG&E and KEPCo when the Wolf Creek plant reaches the end of its useful life. It is only by taking prophylactic steps now that the present and future customers of the participating utilities can avoid some of the uncertainties associated with decommissioning. We therefore direct KEPCo to prepare and submit for Commission review and approval a plan for accruing and maintaining a sinking fund, to be used solely to defray its portion of the expenses and decommissioning, based upon KEPCo's pro rata share of the decommissioning expense as projected by KG&E in this docket. The actual implementation of this plan will not take place until the Wolf Creek plant is in commercial operation."

KEPCo objected to the sinking fund requirement as an unlawful invasion of the province of management and as not based upon substantial competent evidence and thus unreasonable. The district court found this condition on the granting of a certificate to be both unlawful and unreasonable. The trial court reasoned as follows:

"While the Commission may regulate in the public interest, this was apparently accomplished when it did not find any objection to the provision for decommissioning included in the depreciation expense. When the Commission further ordered the establishment of a sinking fund, it 'invaded the province of management' by attempting to direct the investment of KEPCo's revenues. The Court does not understand the Commission to have found any action or proposal by KEPCo's management with respect to the investment of its revenues to have been unjust, unreasonable, or in any way harmful to the public interest so as to invoke the police power of the state which underlies all such regulation. It simply substituted its judgment for that of KEPCo's trustees in an essentially management function. If the Commission should be held to possess the power to assert its influence this far into the management of a utility company absent a finding of harm to the public interest under the current management scheme, it should be so held only upon a clear showing that the Legislature intended the Commission to have such power. This showing is wholly absent and the condition is outside the Commission's power, authority and jurisdiction."

The trial court also found that there was no substantial competent evidence in the record to support the decision of the KCC to require a decommissioning sinking fund.

We have concluded that the trial court erred in arriving at this decision and that the condition requiring KEPCo to submit to the KCC for its review and approval a plan for the establishment of a sinking fund to cover KEPCo's share of the decommissioning expenses was a lawful condition and that there is substantial competent evidence in the record to support the condition imposed. We agree with the KCC that the real question presented is whether the KCC possesses the authority to require a utility to

take action necessary to forestall a future problem that will ultimately affect the utility buyers in Kansas, when a utility seeks authority to operate in Kansas as a public utility. We hold that the condition imposed was reasonable and within the authority of the KCC and that in imposing the condition it was taking reasonable preventive steps in an area which directly and immediately affects the public interest and welfare.

In the evidentiary record, we note that KEPCo's primary witness, David A. Springs, an engineering consultant, indicated that there are two basic methods by which the funds necessary to meet the cost of decommissioning can be accumulated and set aside. One is to increase the utility's depreciation expense and invest the money in new utility plants. At the time the funds to pay for the decommissioning costs are needed, the utility would have to borrow against the plant to raise the needed funds.

The second approach is to again increase the depreciation expense, but to put it in an interest bearing fund until such time as the money is needed, when it will be available. The trial court correctly noted that this witness did not favor the use of a sinking fund, but strongly felt that investing these monies in utility plants was the best approach. Thus the evidence presented at the hearing showed two methods of meeting the decommissioning expenses, investing in a plant or accruing a fund. While KEPCo favored the investment approach, it was apparent that the KCC was not persuaded. The evidence on this point was not very extensive, but it was sufficient to support the position of the KCC order which ordered *the submission and preparation of a plan for the establishment of a sinking fund.* That is the only direction which the KCC gave to KEPCo.

Counsel for the KCC in their brief state that, under the order of the KCC, KEPCo may submit along with such a plan any other alternative approaches which KEPCo might wish KCC to consider. Of necessity, KG&E and KCP&L, the major owners of the Wolf Creek plant, would also be required to submit an overall plan in which the three utilities, as owners of the Wolf Creek plant, would be required to participate. In our judgment, the KCC not only had the power to require KEPCo to submit such a plan but would have been derelict in its duty to the public if it had not required the submission of a plan for decommissioning. The record clearly shows that in June and July of 1980, when this

hearing was held, the problem of decommissioning a nuclear power plant was an unexplored area in which there had been little experience. Apparently the problem of financing a decommissioning plan for Wolf Creek had not at that time been considered by the Nuclear Regulatory Commission (NRC). The decommissioning of a nuclear plant is a difficult problem which must be considered in the construction of nuclear power plants. *New England Coalition v. U.S. Nuclear, Etc.*, 582 F.2d 87 (1st Cir. 1978).

During the early stages of the development of nuclear technology in the United States, the regulation and control of nuclear power resided exclusively in the hands of the federal government which owned and operated such nuclear facilities as were in existence at that time. The passage of the Atomic Energy Act of 1954, 42 U.S.C.A. § 2011 *et seq.*, which established the Atomic Energy Commission and authorized the Commission to regulate and promote the use of nuclear power, marked the first legislative approval of the concept of private ownership and use of nuclear materials for purposes of energy production. In 1959, 42 U.S.C.A. § 2021, a new section, specifically addressed the issue of cooperation between the federal and state governments and delineated limited instances in which state regulation of nuclear materials was proper. The extent of permissible state regulation of nuclear power plants has been a matter of controversy and litigation. See the cases cited in the annotation in 82 A.L.R.3d 751.

The point is that both the federal government, acting through the NRC, and the states, acting through their regulatory commissions, have become vitally interested in all aspects of nuclear power, including the problem of decommissioning a nuclear power plant. From our review of the record and the order of the KCC in this case, we find that that portion of the order of the KCC, requiring KEPCo to submit to the KCC for its approval a plan for the establishment of a sinking fund to defray KEPCo's share of the expenses for the decommissioning of Wolf Creek, was not unlawful or unreasonable. The KCC has not finally determined whether KEPCo must have its funds for decommissioning placed in an interest-bearing sinking fund. The final determination of that issue must, of necessity, involve not only KEPCo but also KG&E and KCP&L and must also require a

consideration of the regulations of the federal Nuclear Regulatory Commission which at that time might be applicable. We disagree with the district court that this condition constituted an interference in the internal management of KEPCo. The KCC was properly concerned with an extremely important matter which must be finally determined in another proceeding at a future time. We hold that the district court erred in finding Condition No. 3 to be unlawful and unreasonable.

<u>Condition No. 4 — Requiring a Wolf Creek power outage contingency fund</u>

A second area of concern for the KCC with respect to the Wolf Creek generating station was the possibility of an unexpected and prolonged power outage at that facility. Such an occurrence would require KEPCo to purchase replacement power to adequately supply its consumers. The KCC found that the utilities participating in Wolf Creek had made no provision for the expense of having to procure replacement power should the Wolf Creek plant experience an unexpected and prolonged outage. The KCC required KEPCo to submit "a projection of anticipated expenses for the purchase of replacement power due to unscheduled outages of the Wolf Creek plant, and a plan for accruing a contingency fund sufficient to cover such expenses." The district court considered this requirement and held that it was within the KCC's power, incident to its obligation under K.S.A. 66-131, to inquire into KEPCo's plans concerning replacement power supplies and the anticipated cost thereof, because a public utility has a duty to furnish reasonably efficient and sufficient service at just and reasonable rates (K.S.A. 66-107). Since an unexpected power outage at Wolf Creek could materially affect both service and rates, the KCC had the power to require KEPCo to submit a plan concerning replacement power.

The district court held, however, that that portion of the KCC order requiring the establishment of a specific fund to defray any increase in cost due to a power outage, constituted an invasion of the power of KEPCo's management to direct the investment of its revenues and was thus unlawful. The trial court rejected KEPCo's contention that the KCC lacked jurisdiction to deal with this issue, because it was not mentioned in the pleadings or notice of hearing. We hold that the trial court correctly determined that the KCC had the authority and duty to require

KEPCo to formulate and submit to the KCC a plan for the purchase or replacement of power due to unscheduled outages at the Wolf Creek plant. We further agree with the trial court that there were no procedural defects which precluded KCC from dealing with that issue.

We disagree, however, with the trial court's decision that the KCC exceeded its authority in requiring KEPCo to submit, for its approval, a proposal for the establishment of a contingency fund which would be held for the sole purpose of defraying extraordinary expenses caused by power outages. In our judgment, this requirement does not constitute a final determination by the KCC that a contingency fund for the purchase of replacement power must be established. The KCC's order went no further than to direct the *preparation and submission of a plan* to finance replacement power acquisitions during unexpected outages. KEPCo's plan must, of necessity, be prepared in cooperation with KG&E and KCP&L. The KCC order merely requires that KEPCo submit to it a plan that would demonstrate that it has sufficient financial resources to service customers at all times. KEPCo is free to formulate and present a plan as it sees fit and it can present to the KCC any alternatives it feels are appropriate. At some future time, the KCC will consider the most reasonable method to assure that KEPCo and the coowners of the Wolf Creek plant will have sufficient financial resources on hand to service their customers in case of power outages at the Wolf Creek plant. We hold that the district court erred in declaring Condition No. 4 unlawful.

In view of our disposition of the appeal, we find that the issue raised on the cross-appeal is now moot and need not be considered.

For the reasons set forth above, we hold that the judgment of the district court is affirmed in part and reversed in part. The case is remanded with directions to the district court to remand the case to the KCC for further proceedings consistent with this opinion.