The KAW VALLEY ELECTRIC
COOPERATIVE COMPANY,
INC., Plaintiff–Appellant,

v.

KANSAS ELECTRIC POWER COOPER-
ATIVE, INC., and Kansas Electric Co-
operatives, Inc., Defendants–Appellees.

No. 87–1078.

United States Court of Appeals,
Tenth Circuit.

April 11, 1989.

James M. Caplinger (James M. Caplinger,
Jr. and Mark E. Caplinger with him on the
brief) of James M. Caplinger, Chartered,
Topeka Kan., for plaintiff-appellant.

Craig Kennedy of Kassebaum & John-
son, Wichita, Kan. (John Philip Kassebaum
of Kassebaum & Johnson, Wichita, Kansas,
and Harold Haun, Staff Counsel, Kansas
Electric Power Cooperative, Inc., Topeka,
Kansas, with him on the brief), for defen-
dant-appellee Kansas Elec. Power Co-op.,
Inc.

Michael J. Grady and James L. Grimes of
Cosgrove, Webb & Oman, Topeka, Kan.,
filed a brief for defendant-appellee Kansas
Elec. Co-op., Inc.

Before SEYMOUR and EBEL, Circuit
Judges, and RUSSELL,* District Judge.

SEYMOUR, Circuit Judge.

Plaintiff Kaw Valley Electric Coopera-
tive brought suit against defendants Kan-
sas Electric Power Cooperative (KEPCo)
and Kansas Electric Cooperatives (KEC),
charging them with a conspiracy to violate
federal and Kansas antitrust laws. On de-
fendants' motion for summary judgment,
the district court held that the suit had
been brought outside the four-year statute
of limitations period. We affirm.

I.

Summary judgment is appropriate only if
there is no genuine issue of material fact
and the moving party is entitled to a judg-
ment as a matter of law. Fed.R.Civ.P.
56(c); *Maughan v. SW Servicing, Inc.,* 758
F.2d 1381, 1387 (10th Cir.1985). In review-
ing the judgment below, we must view the
evidence in the light most favorable to the
nonmoving party. *Maughan,* 758 F.2d at
1387; *Lindley v. Amoco Production Co.,*

* The Honorable David L. Russell, United States
District Judge for the Western District of Okla-
homa, sitting by designation.

639 F.2d 671, 672 (10th Cir.1981). After reviewing the record under these standards, we determine the undisputed facts to be as follows.

Kaw Valley is a rural electric cooperative (REC). Defendant KEC was incorporated in 1941 as the trade association for Kansas RECs. All Kansas RECs either are or have been members of KEC. In 1973, KEC embarked on a program to develop power supplies for Kansas RECs. This program was to take place under the auspices of a newly created power and energy department. At that time, individual RECs, including Kaw Valley, signed an agreement to participate in and fund the efforts of the KEC Power and Energy Department. In 1975, that department was incorporated as defendant KEPCo. This move was apparently necessary because KEC was not a public utility, and the Power and Energy Department needed such an entity in order to receive and transmit power, as well as to acquire ownership interests in power-generating projects.[1] KEPCo maintained a separate board of directors, but shared management, staff, and office facilities with KEC. Kaw Valley joined KEPCo in June 1976, but withdrew shortly thereafter.

Contemporaneously with these developments, KEC was negotiating with the Southwestern Power Administration (SWPA) for the purchase of hydroelectric power for distribution to Kansas RECs. In April 1979, KEPCo entered into a contract with SWPA to purchase ninety megawatts of SWPA power.[2] In 1974, Kaw Valley had apparently initiated efforts on its own to obtain SWPA power. It had been asked by KEC at that time to cease discussions with SWPA so that KEC could become the sole bargaining agent on behalf of Kansas RECs. Kaw Valley therefore felt entitled to the power from the 1979 contract. In October 1979, however, the KEPCo board of trustees formally adopted a policy whereby it disclaimed any responsibility for the power needs of nonmember RECs such as Kaw Valley, and specifically declared that it had neither the authority nor the obligation to allocate any portion of the SWPA power to nonmembers.

Kaw Valley challenged this policy by opposing KEPCo's application to the Kansas Corporation Commission for public utility status. This effort met with initial success, as the commission conditioned its grant of utility status to KEPCo on allocation of a portion of the SWPA power to Kaw Valley. This condition was ultimately held illegal by a decision of the Kansas Supreme Court in 1984. *See Kansas Elec. Power Coop. v. Kansas Corp. Comm.,* 235 Kan. 661, 683 P.2d 1235 (1984).

In an effort to avert a lawsuit,[3] KEPCo offered Kaw Valley a small share of the SWPA power in February 1981. Kaw Valley refused. In May 1982 and January 1984, KEPCo received additional allotments of power under the 1979 SWPA contract, none of which it diverted to Kaw Valley. On July 11, 1984, Kaw Valley demanded in writing a share of the power, but KEPCo again disclaimed any obligation to provide Kaw Valley with power. On January 9, 1985, Kaw Valley filed this lawsuit.

1. Kaw Valley at points seems to contest the reasons for KEPCo's formation and numerous details regarding the precise contours of the relationship between KEC and KEPCo. None of these facts are material to the resolution of the statute of limitations issue contested on appeal here.

2. Kaw Valley argues vociferously that whether KEC or KEPCo negotiated the contract cannot be resolved at this stage of the proceedings. Again, this is not relevant to the limitations issue addressed here.

3. Kaw Valley characterizes this description as an inference to its detriment, contrary to the standards of Rule 56. However,

"[R]ule 56(c) of the Federal Rules of Civil Procedure states unequivocally that in order to defeat a motion for summary judgment, the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.' Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants."

*United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (citations omitted).

There is documentary evidence supporting the proposition that the offer was to avert litigation. Rec., vol. I, doc. 73, ex. J, at 1. Kaw Valley has pointed to no contrary evidence in the record to support its view.

## II.

On defendants' motion for summary judgment, the district court dismissed the action on the ground that it was brought outside the four-year statute of limitations period for federal antitrust claims, and the three-year period for Kansas claims. The court held that the limitations period began to run in October 1979, when Kaw Valley was first injured by KEPCo's adoption of its policy against providing power to non-members. The court rejected Kaw Valley's contention that KEPCo's receipt of SWPA power in 1982 and 1984, and its refusal in 1984 to allocate SWPA power to Kaw Valley, constituted separate injurious antitrust acts. The court also refused to attach any significance to KEPCo's 1981 offer to Kaw Valley of a small portion of SWPA power.

The statute of limitations for federal antitrust actions is four years. *See* 15 U.S.C. § 15b (1982). The general rule is that an antitrust "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971); *see also Curtis v. Campbell–Taggart, Inc.*, 687 F.2d 336, 337 (10th Cir.), *cert. denied*, 459 U.S. 1090, 103 S.Ct. 576, 74 L.Ed.2d 937 (1982). A relevant permutation to this general rule is that

> "[i]n the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."

*Zenith Radio*, 401 U.S. at 338, 91 S.Ct. at 806.[4] Kaw Valley argues that this exception is applicable here.

The Ninth Circuit has stated that to come within the continuing conspiracy exception a plaintiff must show that it has been injured by "continued, separate antitrust violations within the limitations period." *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir.1986), *cert. denied*, 479 U.S. 886, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986). The exception thus has two requirements that are not entirely consistent: the acts in question must be distinct from the acts outside the limitations period, but they must continue the same conspiracy. The Fifth Circuit has determined that a continuing violation and a new cause of action exist only if acts committed within the limitations period are somehow more than "the abatable but unabated inertial consequences of some pre-limitations action." *Poster Exchange, Inc. v. National Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).[5] These cases hold, as the Ninth Circuit recently summarized, that:

> "two elements characterize an overt act which will restart the statute of limitations: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff."

*Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir.1987).

The most helpful cases for present purposes concern refusals to deal. Courts in these cases have had to determine whether a continuing refusal to deal constitutes one cause of action, accruing with the initial

---

4. Under a second exception, if future damages are unascertainable, a cause of action for such damages does not accrue until they occur. *Zenith*, 401 U.S. at 339, 91 S.Ct. at 806. We need not address the speculative damages exception because Kaw Valley has not raised it.

5. A few concrete rules have emanated from these broader pronouncements. For example, the mere receipt of benefits within the limitations period from antitrust violations that occurred outside the limitations period does not give rise to a new cause of action. *Aurora*

*Enter. v. National Broadcasting Co.*, 688 F.2d 689, 694 (9th Cir.1982). Similarly, a victim does not have a new cause of action if, within the limitations period, a violator collects payments on an illegal contract executed outside the limitations period that established with finality "the rights and liabilties of [the] parties [to the contract]." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1053 (5th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983).

refusal, or separate causes of action accruing with each instance of a refusal. The cases have concluded that if the initial refusal is final, the statute of limitations begins to run and no new cause of action is created when the victim makes subsequent futile efforts to deal with the violator and is rebuffed. If the initial refusal is not final, each time the victim seeks to deal with the violator and is rejected, a new cause of action accrues. *See Pace Indus.*, 813 F.2d at 237–39; *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714–15 (11th Cir.1984).

The operation of this rule is well illustrated by three Ninth Circuit cases. In the first of these cases, *AMF, Inc. v. General Motors Corp. (In Re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68 (9th Cir.), *cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979), the court held that a pre-limitations decision by automakers not to purchase antipollution devices from the plaintiff was final. Unsuccessful sales contacts within the limitations period did not create a new and separate cause of action because "[t]hese ... were forlorn inquiries by one all of whose reasonable hopes had been previously dashed." *Id.* at 72. The previous decision was considered final, in part, because it represented a decision by the automakers to develop and produce their own antipollution devices. The finality of the pre-limitations decision coupled with the practicalities of the market for such antipollution devices permanently excluded the plaintiff. The Court thus invoked the principle that when "all the damages complained of necessarily result from a pre-limitations act by defendant, no new cause of action accrues for any subsequent acts committed by defendant within the limitations period *because those acts do not injure plaintiff.*" *Id.* at 72 (quoting *Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029, 1035 (5th Cir.) (emphasis in original), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed. 2d 132 (1977)).

The court employed similar reasoning in *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936 (9th Cir.), *cert. denied*, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981), when it held that repeated requests within the limitations period by the plaintiff that the defendants allow it to retail the defendant's products did not create a new cause of action. The court noted that every later refusal to deal was a mere reiteration of the defendant's first, pre-limitations refusal, and that "any injury to [plaintiff] resulted from [defendant]'s [first] refusal to sell." *Id.* at 938.

The facts of these two cases contrast with those of *Hennegan*, 787 F.2d 1299. A tourist shop sued tour guide organizations for conspiring to herd tourists away from it and into other tourist shops. Each instance of the alleged wrongful conduct was a new and independent act that injured plaintiff anew, rather than merely a reaffirmation of a previous refusal. *Id.* at 1301.

In our view, application of the rule enunciated in these cases to Kaw Valley's claims will further the purposes of the statute of limitations. If KEPCo's 1979 decision not to share power with nonmembers was final, Kaw Valley knew at that time the full parameters of any cause of action it had against KEPCo. If the decision was final, there is no reason to grant Kaw Valley the ability to restart the statute whenever it so desires by a mere futile request for power.

Whether the decision in 1979 was final is a question of fact. When a proper motion for summary judgment is made, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A court must examine the record and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). We have examined the record in this case and find nothing indicating that the 1979 decision was not final, but significant evidence indicating the contrary.

The form the decision took indicates its finality—it was passed as a formal resolu-

tion of the KEPCo board of trustees. The language of the resolution indicates its finality as well. After setting forth a series of reasons, including that nonmembers do not share in the collective financial risks of KEPCo, the document concluded:

"A. It shall be the policy of KEPCo that KEPCo has no power supply responsibility to non-member rural electric cooperatives and that KEPCo has no authority or obligation to allocate a portion of its SWPA power to a non-member or to anyone who is not participating in the total power supply program;

"B. It shall further be the policy of KEPCo that in order to provide the maximum benefit to its member cooperatives and to the consumer members they serve, and to provide for the necessary security for loans that have been or will be obtained by KEPCo, KEPCo will not provide the benefit of its SWPA power to non-members or to anyone that does not participate in KEPCo's total power supply program."

Rec., vol. I, doc. 73, ex. I, at 16. We find it particularly significant that KEPCo did not merely refuse to share power, it disclaimed any responsibility to supply power to RECs that did not take part in the total power supply program. This sent a clear message to Kaw Valley that if it wanted power, it would have to join up or litigate.

The only factual circumstance Kaw Valley can point to that might compromise the finality of the 1979 decision is the 1981 offer of a portion of the SWPA power. An offer to avoid litigation, however, does not contradict the finality of the 1979 policy statement that KEPCo had no obligation to provide Kaw Valley with power. The size of the offer in relation to Kaw Valley's demands, coupled with the litigation context, is perfectly consistent with the finality of the policy decision in 1979 that KEPCo had no obligation to provide Kaw Valley with power.

Because the 1979 decision that KEPCo had no obligation to share the SWPA power with nonmember RECs was final and took place outside the limitations period, Kaw Valley's antitrust claims are time barred.

The judgment below is affirmed.