**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 7, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHAMPAGNE METALS, an
Oklahoma Limited Liability Company,

      Plaintiff - Appellant,

v.

KEN-MAC METALS, INC., an Ohio
corporation, SAMUEL, SON & CO.,
LIMITED, an Ontario, Canada
corporation, SAMUEL SPECIALTY
METALS, INC., a New Jersey
corporation, METALWEST, L.L.C.,
an Alabama limited liability company,
INTEGRIS METALS, INC., a New
York corporation, EARLE M.
JORGENSEN COMPANY, a Delaware
corporation, and RYERSON TULL,
INC., an Illinois corporation,

      Defendants - Appellees.

Nos. 04-6222 & 05-6139

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-02-528-C)**

---

Clyde A. Muchmore, Crowe & Dunlevy, Oklahoma City, Oklahoma, (D. Kent
Meyers and Mark S. Grossman, Crowe & Dunlevy, Oklahoma City, Oklahoma,
and Michael Burrage, Burrage Law Firm, Durant, Oklahoma, with him on the
briefs), for Plaintiff-Appellant.

Jeffrey W. Sarles, Mayer, Brown, Rowe & Maw LLP, Chicago, Illinois (David A. Ettinger, Honigman Miller Schwartz & Cohn, LLP, Detroit, Michigan, M. Richard Mullins, McAfee & Taft, A Professional Corporation, Oklahoma City, Oklahoma, Mark McLaughlin and Susan Nystrom Ellis, Mayer, Brown, Rowe & Maw LLP, Chicago, Illinois, Drew Neville, B.J. Rothbaum, Charles E. Geister III, Hartzog, Conger, Carson & Neville, Oklahoma City, Oklahoma, William J. O'Shaughnessy, McCarter English, Newark, New Jersey, Murray E. Abowitz, Abowitz, Timberlake & Dahnke, Oklahoma City, Oklahoma, Timothy R. Beyer, Brownstein Hyatt & Farber P.C., Denver, Colorado, Michael A. Rubenstein, McKinney & Stringer, PC, Oklahoma City, Oklahoma, David L. Hashmall, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, Minnesota, Glen D. Huff and Steven J. Johnson, Foliart Huff Ottaway & Bottom, P.C., Oklahoma City, Oklahoma, Allan B. Goldman and Charles M. Stern, Katten Muchin Zavis Rosenman, Los Angeles, California, Alfred P. Murrah, Jr. and Fred A. Leibrock, Phillips McFall McCaffrey McVay & Murrah, P.C., Oklahoma City, Oklahoma, with him on the briefs), for Defendants-Appellees.

---

Before **KELLY, SEYMOUR**, and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

After working in the aluminum industry for years, Michael Champagne struck out on his own and formed Champagne Metals ("Champagne"), an aluminum distributor (or "service center"). Service centers operate as middlemen in the industry, buying aluminum from mills and selling that aluminum to end users. Claiming that there exists an understanding in the industry to exclude new competitors, Champagne brought suit against a slew of older, more established service centers alleging violations of federal and state antitrust laws and unlawful interference with business relationships. After extensive briefing, the district court excluded Champagne's economic expert, granted summary judgment for the

- 2 -

defendants on all claims, and awarded costs to the defendants. Champagne

challenges all three rulings on appeal. We find that the district court did not

abuse its discretion in excluding Champagne's expert witness and therefore

AFFIRM the district court's order on that issue. However, we disagree with

portions of the district court's rulings as to the federal and state law claims and

thus AFFIRM in part and REVERSE in part the district court's grant of summary

judgment. Finally, as we are reversing the grant of summary judgment, we

VACATE the district court's award of costs.[1]

## BACKGROUND

Defendants-Appellees Ken-Mac Metals, Samuel, Son & Co., Samuel

Specialty Metals, Metalwest, Integris Metals, Earle M. Jorgensen Co., and

Ryerson Tull (collectively, the "Established Distributors") are all service centers

in the aluminum industry, as is Champagne. Service centers compete both with

other service centers and with mills for sales to end users; indeed, over half of

sales to end users are made by the mills directly. In the region in which

Champagne and the Established Distributors operate—an area encompassing

Colorado, Kansas, Missouri, Illinois, New Mexico, Texas, Arkansas, and

Louisiana—there are approximately forty service centers. Champagne contends

---

[1] We provisionally allowed the parties to file their briefs and the record under seal. To the extent this opinion cites to sealed portions of the briefs and record, those portions are unsealed. As to all remaining portions of the briefs and records, we GRANT the parties' motions to seal.

that not all service centers compete on the same aluminum products and that only the Established Distributors are its day-to-day competitors.

There are six "leading" mills in North America: Alcan Aluminum Corporation; Alcoa, Inc.; Commonwealth Industries, Inc.; Kaiser Aluminum Corporation; Ormet Corporation; and Pechiney. These mills each specialize in one or more of five different types of aluminum: mill finish common alloy aluminum, heat-treated aluminum, common alloy tread, common alloy painted aluminum, and aluminum roof. The leading mills have select distribution systems—they specifically designate one or more service centers as "recognized distributors" through whom they sell their products.[2] Each of the Established Distributors is recognized by at least two mills; none is recognized by all six.

Champagne was founded in 1996 by Michael Champagne, a former employee of Earle M. Jorgensen Co. Champagne's planned customer base was the horse trailer manufacturing industry, an industry with which Champagne's founder had well-established relationships and that Jorgensen was beginning to de-emphasize. Of the five types of aluminum produced by the mills, three are key to Champagne's business—tread, painted, and roof coil. As the aluminum products are not readily exchangeable, and because end users often prefer specific

---

[2] Although service centers can purchase aluminum from sources other than North American mills (such as brokers, mill depots, other service centers, or foreign mills), those options are frequently less desirable because of price and quality concerns.

mills, Champagne contends that access to more than one mill is critical if it is to be able to compete effectively.

Commonwealth recognized Champagne as a distributor a few months after Champagne's founding, but did not always offer the same pricing rebates to Champagne as it offered to its other recognized distributors.[3] Also, Commonwealth did not sell all of the aluminum products that Champagne required. Although no other mill designated Champagne a "recognized distributor," Champagne was able to buy certain products from Pechiney. And two other mills—Alcan and Kaiser—at least occasionally sold limited products to Champagne.

Champagne contends that the difficulties in establishing relationships with mills and in acquiring the necessary aluminum products stem from a conspiracy among the Established Distributors. Specifically, Champagne claims that the Established Distributors threatened to move their business from mills that agreed to deal with Champagne. According to Champagne, this conspiracy existed not only to force it out of business, but to deter other service centers generally from entering the market.

---

[3] Rebates are generally given in response to a situation where more than one mill is competing to sell product to the distributor. Because Commonwealth was often the only mill selling to Champagne, Champagne was not offered these "competitive situation" rebates.

In 2002, Champagne filed a complaint with the district court, alleging that the Established Distributors engaged in a horizontal group boycott in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, unreasonably restrained trade in violation of the Oklahoma Antitrust Reform Act, Okla. Stat. tit. 79, § 203, and maliciously and wrongfully interfered with Champagne's business and contractual relationships. After substantial briefing, the Established Distributors moved for summary judgment, which the district court granted on all claims. In a separate order issued the same day, the district court also excluded the report and testimony of Champagne's economic expert.

The Established Distributors then filed motions to recover certain costs, including copying and imaging costs. After a hearing, the clerk of court awarded substantial copying and imaging costs to the Established Distributors, although the awards were less than requested. Champagne moved for the district court to review the costs awards, arguing that the Established Distributors had not met their statutory burden to show that the documents copied and imaged were "necessarily obtained" and that the imaging of certain documents was duplicative. The district court ruled that the clerk's "rule of thumb" that copying costs contracted to an outside vendor were recoverable while internally generated costs were not was reasonable and that the cost of imaging documents produced during discovery was recoverable.

Champagne timely appealed the district court's rulings on both the merits and on costs.

## DISCUSSION

We review the grant of a motion for summary judgment *de novo*, applying the same legal standard as the district court. See, e.g., Welding v. Bios Corp., 353 F.3d 1214, 1217 (10th Cir. 2004). "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)). "When applying this standard, we 'construe all facts and reasonable inferences in a light most favorable to the nonmoving party.'" Id. (quoting Pub. Serv. Co. of Colo. v. Cont'l Cas. Co., 26 F.3d 1508, 1513 (10th Cir. 1994)) (alteration omitted).

### I. Threshold Evidentiary Issues

Before turning to the merits of this appeal, we consider two evidentiary issues: whether the district court's exclusion of the report and testimony of Champagne's economic expert, Dr. Donald Murry, was proper; and whether the district court erred in excluding certain statements of representatives of the mills as hearsay.

## A. Exclusion of Champagne's Economic Expert

The court excluded Dr. Murry's report and testimony on the grounds that his opinions failed to meet the reliability standards of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). "Admission at trial of expert testimony is governed by Fed. R. Evid. 702, which imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" <u>United States v. Gabaldon</u>, 389 F.3d 1090, 1098 (10th Cir. 2004) (<u>quoting</u> <u>Daubert</u>, 509 U.S. at 589). "This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." <u>Dodge v. Cotter Corp.</u>, 328 F.3d 1212, 1221 (10th Cir. 2003).

"We review de novo the question of whether the district court applied the proper legal test in admitting an expert's testimony." <u>Id.</u> at 1223. However, "[t]he district court's decision to admit or exclude expert testimony under the <u>Daubert</u> standard is reviewed on appeal for abuse of discretion." <u>Gabaldon</u>, 389 F.3d at 1098. The court enjoys broad discretion in its ultimate determination of the reliability of an expert; "[w]e will not overturn the trial court's ruling on admissibility unless it is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."

Id. (quotations omitted). The district court plainly applied the correct legal test, thus we are faced only with the question of whether it abused its discretion in excluding Dr. Murry.

As the district court noted, there are two markets in which service centers participate: the "upstream" market, which involves sales of coils of aluminum by mills to service centers; and the "downstream" market, which involves sales of flat-rolled, processed and cut aluminum by service centers to end users. Champagne alleges that the Established Distributors' anticompetitive conduct occurred in the upstream market, and asserted in its complaint that it believed the Established Distributors had "substantial market power" in this market. Indeed, this was the testimony of Dr. Murry, who opined that the Established Distributors had sufficient market power in the upstream market such that a threat by these service centers to shift their purchasing of aluminum away from a mill "represents a credible threat." The problem that the district court identified is that Dr. Murry's testimony is predicated entirely on evidence of the Established Distributors' sales and market share in the downstream market. In other words, although Dr. Murry's opinion discussed the upstream market, the data on which his opinion is based was drawn from the downstream market. The district court found that Dr. Murry offered no "plausible explanation, based on sound economic theory," to support substituting one market for the other.

On appeal, Champagne argues that the district court "misconstrued Dr. Murry's analysis and opinion." Specifically, Champagne claims that it was reasonable for Dr. Murry to use downstream market share as an indicator of upstream market share as "it is reasonable for an economist to conclude, based on experience and what has been confirmed to him about the role of service centers, that any given distributor will sell downstream what it purchased upstream." However, the district court's criticism was not that the explanation offered by Dr. Murry for looking to the downstream market was unreasonable, but rather that Dr. Murry offered no explanation at all. Champagne points to no evidence in the record to support its claim that Dr. Murry <u>actually</u> concluded that the market shares in both markets were reasonably similar, nor does Dr. Murry's report contain such an explanation. While it may be reasonable for an economist to determine that certain markets are interchangeable, we agree with the district court that, here, this explanation "is solely the argument of counsel." In light of this, we cannot conclude that the district court's decision to exclude Dr. Murry's testimony was " arbitrary, capricious, whimsical or manifestly unreasonable." <u>Id.</u>; <u>cf.</u> <u>Koken v. Black & Veatch Constr., Inc.</u>, 426 F.3d 39, 47 (1st Cir. 2005) (not an abuse of discretion to exclude expert's testimony that "failed to articulate any underlying methodology" for determining the expert's opinion); <u>Bitler v. A.O. Smith Corp.</u>, 391 F.3d 1114, 1121 (10th Cir. 2004) ("[W]hen the conclusion

simply does not follow from the data, a district court is free to determine that an

impermissible analytical gap exists between premises and conclusion.").[4]

---

[4] The district court also found that Dr. Murry failed to base his opinions on appropriate facts. Specifically, the district court noted that many of Dr. Murry's opinions were based solely on facts provided by Champagne and ruled that "[n]o reasonable economist would simply accept the self-serving statement of an interested party as fact." It is unclear whether this was intended as an alternative basis for exclusion. In any event, we will address this ground, as it demonstrates an additional defect in Dr. Murry's testimony.

Champagne argues that the district court "fundamental[ly] misunderst[ood] . . . Dr. Murry's role in this case in particular, and the role an economist plays in an antitrust action." Champagne proposes that Dr. Murry's report and testimony "were not intended to confirm factual evidence of Defendants' threats to the mills or the knowledge of these threats within the industry," but rather "Dr. Murry's role in this litigation was to offer the opinion that, assuming such facts are established, an economist would confirm that such threats, and knowledge of them within the industry, would create a barrier to entry in the market."

Champagne is certainly correct in stating that, generally, an economist's role in an antitrust case is not to prove facts, but to opine on economic theory. See, e.g., Gregory J. Werden, Economic Evidence on the Existence of Collusion: Reconciling Antitrust Law with Oligopoly Theory, 71 Antitrust L.J. 719, 789 (2004) ("The role of the expert economist in antitrust cases is to apply microeconomic theory to the messy facts of a case."). However, Champagne fails to identify, nor could we find, any point in Dr. Murry's report or deposition that made clear that he was only assuming the facts he asserted. See generally United States v. Rodriguez-Aguirre, 108 F.3d 1228, 1238 n.8 (10th Cir. 1997) (noting that the appellant bears the responsibility of connecting his arguments to specific citations in the record).

Further, in reviewing Dr. Murry's report, it is not clear to us (nor, do we think, would it be clear to a jury) that this is what Dr. Murry intended to do. For example, Dr. Murry's report states that "Champagne . . . experienced difficulty acquiring sales persons because prospective employees feared Champagne would be unable to acquire the supplies of critical aluminum products from the mills at competitive prices." This sounds like a confirmation (rather than an assumption) of the fact that Champagne had trouble hiring; the district court noted, and Champagne does not refute, that Dr. Murry based this conclusion only on evidence provided by Champagne and "had not spoken with a single potential sales person who declined an offer." The relevance of the district court's concern

(continued...)

- 11 -

**B. Exclusion of Statements of Mill Representatives**

Champagne also argues that the district court erred by excluding statements of mill representatives before testing whether they were admissible under Fed. R. Evid. 801(d)(2)(E)'s exception for statements of co-conspirators. "[W]e review a district court's evidentiary decisions for abuse of discretion." United States v. Griffin, 389 F.3d 1100, 1103 (10th Cir. 2004).

In its briefs to the district court, Champagne argued that statements of both the Established Distributors and the mill representatives should be admitted under this exception. However, at the outset of its order, and without reference to the

---

[4](...continued)
becomes clear when considering why the "fact" that Champagne had trouble hiring was important. Dr. Murry's report goes on to state that "difficulty in assembling a qualified, experienced sales force is a business risk and a deterrent to investment and entry into the service center business. Significantly, these deterrents to entering the service center business are injurious to competition among service centers." In other words, Dr. Murry opined that there was a barrier to entry because of the inability to hire. Champagne claims that the report intended only to "offer the opinion that, assuming [certain] facts were established," there was a barrier to entry. However, the report nowhere makes clear that Dr. Murry is merely "assuming" that Champagne had trouble hiring. Rather, the report conclusively states that Champagne "experienced difficulty acquiring sales persons."

The district court, in performing its gatekeeper function, considers "whether the evidence or testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." Gabaldon, 389 F.3d at 1098 (alterations, quotations omitted). Expert testimony that fails to make clear that certain facts the expert describes as true are merely assumed for the purpose of an economic analysis may not assist the trier of fact at all and, instead, may simply result in confusion. Thus it was not "manifestly unreasonable" for the district court to conclude that Dr. Murry's opinions lacked foundation because they were based on "the self-serving statement[s] of an interested party."

co-conspirator exception, the district court ruled that transcribed conversations and non-deposition statements of mill representatives were hearsay and would only be considered "for the non-hearsay purpose of showing the state of mind of mill decision makers" under Fed. R. Evid. 803(3).

In United States v. Lopez-Gutierrez, 83 F.3d 1235 (10th Cir. 1996), we explained the process by which a district court should determine the admissibility of alleged co-conspirator hearsay evidence: "[t]he court must determine by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the defendant were members of the conspiracy; and (3) the hearsay statements were made in the course of and in furtherance of the conspiracy." Id. at 1242. We further noted that, "[i]n making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with independent evidence tending to establish the conspiracy." Id.

Here, the district court failed to make a "preliminary factual determination" as to whether a conspiracy existed among the Established Distributors and the mills, as required by Lopez-Gutierrez.[5] This legal error was an abuse of

---

[5] This error may stem from the fact that Champagne did not name the mills as defendants in the alleged conspiracy. However, Champagne did argue below that the mills were co-conspirators for evidentiary purposes. The co-conspirator hearsay exception contains no requirement that the declarant be a defendant, only that she be a member of the conspiracy. Cf. United States v. Nixon, 418 U.S. 683, 701 (1974) ("Declarations by one defendant may also be admissible against

(continued...)

- 13 -

discretion.  See generally Clark v. State Farm Mut. Auto. Ins. Co., 433 F.3d 703, 709 (10th Cir. 2005).  On remand, the district court should follow the procedure laid out in Lopez-Gutierrez in determining whether the mill representatives' statements should be admitted under Rule 801(d)(2)(E).[6]

## II.  Federal Antitrust Claim

The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself.  See, e.g., Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 330 (1991).  "Only after an agreement is established will a court consider whether the

---

(...continued)
other defendants upon a sufficient showing . . . of a conspiracy among one or more other defendants and the declarant and if the declarations at issue were in furtherance of that conspiracy. The same is true of declarations of coconspirators who are not defendants in the case on trial.") (emphasis added); United States v. Williams, 989 F.2d 1061, 1067 (9th Cir. 1993) ("An individual need not be indicted to be considered a coconspirator for the purposes of rule 801(d)(2)(E).").

[6] Champagne also complains that the district court failed to consider its evidence cumulatively.  As we are remanding for the district court to make a preliminary factual determination of whether a conspiracy including the mills existed, we need not reach this issue.  However, we emphasize the Supreme Court's admonition in Bourjaily v. United States, 483 U.S. 171 (1987), that

individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts. . . . [A] piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence.

Id. at 179-80.  Thus, as it did with the statements of the Established Distributors, the district court should consider the mill representatives' statements and other evidence together in determining whether, for purposes of the co-conspirator hearsay exception, the evidence makes the existence of a conspiracy more likely than not.

- 14 -

agreement constituted an unreasonable restraint of trade." AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 232 (2d Cir. 1999); see also Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) ("Section 1 of the Sherman Act requires that there be a 'contract, combination . . . or conspiracy'. . . in order to establish a violation.  Independent action is not proscribed.") (citation omitted).  Thus, "to survive [a] motion for summary judgment, the plaintiff[] must first demonstrate the existence of an agreement, whether by direct or by circumstantial evidence." Mitchael v. Intracorp, Inc., 179 F.3d 847, 856-57 (10th Cir. 1999).

## A. Evidence of an Agreement

Champagne attempted to show that a conspiracy existed through both direct and indirect evidence.  In granting the Established Distributors' motions for summary judgment, the district court ruled that none of Champagne's proffered evidence was sufficient to demonstrate a conspiracy.  It found that none of the statements offered as direct evidence clearly indicated an agreement and, thus, that a jury could not reasonably find a conspiracy based on the statements alone. Then, after noting that the range of permissible inferences that may be drawn from circumstantial evidence "will depend on the plausibility of a plaintiff's economic theory," and after finding that Champagne's theory of collusion was, at best, plausible but weak, the district court concluded that the evidence did not tend to support concerted action.

As we conclude that Champagne did adduce direct evidence of a

conspiracy, and as we find that the district court erred in its analysis of the

plausibility of Champagne's economic theory and thus erred in its consideration

of Champagne's circumstantial evidence, we reverse the decision of the district

court on Champagne's federal antitrust claim.[7]

## 1. Direct Evidence

Champagne offered three statements made by various representatives of the

Established Distributors as direct evidence of a conspiracy. On appeal,

Champagne focuses primarily on a statement by Phil Wiley of AFCO, Ryerson's

---

[7] Champagne also argues that the district court should have been "even more cautious" in drawing inferences against Champagne from the record because the court limited the amount of depositions Champagne could take in the case. Champagne cites no authority for its claim that the discovery limitation has an effect on the review of the evidence, and thus we need not even consider the argument. See Eateries, Inc. v. J.R. Simplot Co., 346 F.3d 1225, 1232 (10th Cir. 2003) ("A party forfeits an issue it does not support with legal authority or argument.") (quotations omitted).

In any event, we review rulings relating to discovery for abuse of discretion. See The Procter & Gamble Co. v. Haugen, 427 F.3d 727, 742-43 (10th Cir. 2005). At the start of discovery, Champagne was allowed twenty-five depositions, which was the number it initially requested. The district court subsequently entertained a motion by Champagne to re-open discovery and conduct nine additional depositions. It granted the request for eight of the nine and only denied the request to depose Ken-Mac's Larry Parsons; it did so because Champagne had not offered any justification for waiting "until the twilight of discovery" to request the deposition. See Smith v. United States, 834 F.2d 166, 169 (10th Cir. 1987) (noting that "whether the moving party was diligent in obtaining discovery" is a factor in considering whether to re-open discovery). Champagne points to no other instances in which it requested additional depositions. Under these circumstances, we do not think that the district court abused its discretion in "limiting" discovery.

- 16 -

predecessor, to Matt Zundel, a Commonwealth employee.[8]  Zundel

---

[8] Champagne also pointed to statements by Larry Parsons, president of Ken-Mac Metals, and Debbie Veal, a buyer for Jorgensen.  During a negotiation for the purchase of Champagne by Ken-Mac, Michael Champagne testified that he and Parsons

> were talking about Champagne Metals' inability to purchase aluminum from the mills.  We discussed the fact that [Jorgensen] and some of the other service centers had gotten together and the resulting problems my company had experienced being recognized by Commonwealth.  Mr. Parsons made the comment that he would have gotten it done, meaning kept Commonwealth from selling to Champagne Metals. . . . Mr. Parsons further stated that Champagne Metals was the biggest mistake in his career, and that if he would have known about Champagne Metals, it would have been stopped.  Mr. Parsons implied that the other service centers had messed up, but he could get everyone together to make it happen.

Further, Bill Thomas, a sales representative for Commonwealth, stated that Veal said she wished Commonwealth would not recognize Champagne, and that

> she had been in touch with her counterparts, who were part of the National Association of Aluminum Distributors group . . . , and that they were not at all happy about it, and they had more clout and [Commonwealth] probably would listen—would be—would have to listen to them.

As to the Parsons' statement, we first note that the district court excluded the portion of Champagne's affidavit referring to Jorgensen and other service centers getting together as inconsistent with Champagne's deposition testimony, and it is not clear that Champagne appeals that decision.  In any event, the statement at best showed that Parsons "implied" that there would be collective action.  Direct evidence "is explicit and requires no inferences" to establish concerted action, thus this implication of collective action cannot suffice.  See In re Baby Food Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999).  Similarly, Veal's statement, while perhaps an admission that the service centers individually would attempt to force Commonwealth to stop dealing with Champagne, contains no suggestion of any agreement between the service centers.  Thus we agree with the district court that these statements "lack[] the requisite 'clarity' to constitute

(continued...)

claimed that Wiley told him that the relationship between Commonwealth and

Champagne was damaging to the industry as a whole and that Wiley

> felt that by our participation with Champagne Metals, that <u>himself and other potential customers</u> within the industry would find that Commonwealth selling to Champagne, <u>they</u>—they would find that as, again, not in the best interest of the industry, and <u>would cause other distributors</u> in that area of the country <u>to source their metals from other mill sources</u>, and that by developing a relationship with Champagne Metals, we would be putting other business with potential customers at risk.

(Emphases added.)  We agree with Champagne that this statement is direct

evidence of collusive action.[9]

"Direct evidence in a Section 1 conspiracy must be evidence that is explicit

and requires no inferences to establish the proposition or conclusion being

asserted. . . . [W]ith direct evidence the fact finder is not required to make

inferences to establish facts."  <u>In re Baby Food Antitrust Litig.</u>, 166 F.3d at 118

(quotations omitted).  Here, the statement is explicit—Wiley claimed that

"himself and other potential customers  . . . would cause other" service centers to

remove their business from Commonwealth if Commonwealth continued selling to

---

[8](...continued)
direct evidence."

[9] Although it is possible to construct ambiguity in almost any statement, the Established Distributors do not offer us any other discrete interpretation of this statement that would move it into the category of circumstantial evidence.

Champagne.[10]  Viewed in the light most favorable to Champagne, this statement indicates an agreement among service centers to take collective action.  See Rossi v. Standard Roofing, Inc., 156 F.3d 452, 468-69 (3d Cir. 1998) (finding the plaintiff's testimony that he was told by one of his competitors that "if [the plaintiff] went into business that [the competitor] and [another competitor] would do anything they could, stop supplies, cut the prices, whatever they had to do they were going to do to keep me out of business" to be direct evidence of concerted action).

Our conclusion that Champagne has adduced some direct evidence, however, does not mean that Champagne has necessarily shown the existence of a genuine issue of fact, sufficient to survive summary judgment, as to whether the Established Distributors entered into an illegal agreement.  Although "[t]he burden of showing the absence of a genuine issue of material fact . . . is upon the movant," Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d 1193, 1196 (10th Cir. 2005), the nonmovant "'must do more than simply show that there is

_____

[10] Indeed, the district court's example of group boycott mechanics, which it cites to show that there was not direct evidence of a conspiracy here, actually demonstrates that Wiley's statement was direct evidence.  The district court, citing the Handbook of the Law of Antitrust, explained that in a group boycott

> [t]he boycotting members, in effect, say to their suppliers . . . , "If you don't stop dealing with the non-group members, we will stop dealing with you."  If continued trade with group members is more important to a supplier . . . than is trading with non-group members, this threat will be effective.

- 19 -

some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). Therefore, summary judgment is appropriate unless the nonmoving party "'make[s] a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). The nonmovant makes this showing only by presenting "facts such that a reasonable jury could find in [its] favor." Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005) (quoting Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.1999)). Wiley's statement, alone, does not meet this burden. For example, it does not indicate which, if any, of the Established Distributors were among the "other customers" which were part of the agreement. Where, as here, a plaintiff adduces only weak direct evidence, which by itself is insufficient to defeat summary judgment, additional circumstantial evidence is required to overcome a motion for summary judgment. See Rossi, 156 F.3d at 469 (noting that plaintiff's direct evidence of an agreement was not enough to survive summary judgment and looking to circumstantial evidence as well).

## 2. Circumstantial Evidence

Champagne argues that the district court erroneously devalued its circumstantial evidence by concluding that the economic theory underlying Champagne's claim made little to no economic sense.

- 20 -

The district court began by noting that the range of inferences that can be drawn from circumstantial evidence varies with the strength of the proffered economic theory—the more economically rational a conspiracy is in a given situation, the broader the range of inferences than can be drawn from the evidence. This maxim is undoubtedly true when a plaintiff makes out a case based only on circumstantial evidence. See, e.g., IV Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law 71 (2d ed. 2003) [hereinafter Areeda & Hovenkamp] ("The Supreme Court [in Matsushita] held that no conspiracy may be inferred from merely circumstantial evidence in the absence of a plausible motive to conspire.") (emphasis added). Champagne also correctly notes that "concerns over the reasonableness of inferences" do not apply to direct evidence of an agreement. Rossi, 156 F.3d at 466. In other words, when evaluating direct evidence of an agreement, we need not worry whether such an agreement would have been a rational one to enter into; antitrust law "do[es] not . . . save defendants who have clearly, though foolishly, conspired." II Areeda & Hovenkamp 101.

The more difficult question, we think—and a question that the parties do not squarely address—is whether, when direct evidence has been introduced, we must still evaluate the economic rationality of the alleged conspiracy when considering the accompanying circumstantial evidence. Some courts have held that economic rationality is inapplicable in a case with direct and circumstantial

evidence.  See Rossi, 156 F.3d at 466 ("[T]he Matsushita standard only applies when the plaintiff has failed to put forth direct evidence of conspiracy."); In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 906 F.2d 432, 441 (9th Cir. 1990) ("[T]he Matsushita standards do not apply when the plaintiff has offered direct evidence of conspiracy."); see also II Areeda & Hovenkamp 104 ("[S]everal courts have indicated that Matsushita standards do not apply when the plaintiff has offered direct evidence of conspiracy.") (quotations omitted).

Given that the parties do not brief this issue on appeal, and given our conclusion, below, that the alleged conspiracy is economically rational such that restrictions on the inferences drawn from Champagne's circumstantial evidence are not warranted, we do not decide whether Champagne's weak direct evidence suffices by itself to remove this case from the Matsushita framework.

The district court determined that Champagne's economic theory was, at best, "plausible but weak," and that therefore the range of permissible inferences to be drawn from the circumstantial evidence was limited.[11]  We disagree.

As we have explained,

_____

[11] The district court actually found that Champagne's theory made no economic sense at all and that it "would have no qualms granting summary judgment" on this ground alone.  However, the court was willing, "for the purpose of testing [Champagne's] economic evidence, to assume that the theory makes 'some' sense."

[c]ircumstantial evidence may support the existence of an illegal § 1 agreement. However, on summary judgment, antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. To survive a motion for summary judgment, a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. Thus, the acceptable inferences which we can draw from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the danger associated with such inferences.

Mitchael, 179 F.3d at 858 (alterations, citations, quotations omitted).

Below, the Established Distributors argued that they had no motive to engage in a group boycott because they did not have the power to raise prices or decrease output. Champagne countered that the Established Distributors were not boycotting in order to establish or maintain supracompetitive prices but instead were acting to avoid price cutting and to maintain market share.

The district court expressed considerable doubt about Champagne's theory. It noted that, although Champagne alleged that the boycott was to preserve the market and price structure of the industry, Champagne did not claim that there was any separate price-fixing or market-allocation agreement,[12] nor was there any

_____

[12] To the extent that this is a suggestion that a group boycott cannot be a violation of the antitrust laws without a concomitant price-fixing or market allocation agreement, the district court is incorrect. Exclusionary group boycotts and collusive agreements to set price or market share are two different theories of antitrust liability. See, e.g., Kenneth L. Glazer, Concerted Refusals To Deal Under Section 1 Of The Sherman Act, 70 Antitrust L.J. 1, 4-5 (2002) ("'[C]ollusive' agreements are agreements aimed directly at improving the terms (price or non-price) on which suppliers deal with their customers . . . [W]hen firms act in a 'collusive' manner, they aim to replicate the pricing and other conduct of a single-firm monopolist by exercising joint monopoly power. . . .

(continued...)

- 23 -

evidence of collusion on price or supply. To the contrary, the district court found ample evidence of competition between the Established Distributors. Moreover, the district court pointed out that there was no evidence of the Established Distributors' market power and that it was unclear, based on the structure of the industry, whether a smaller, more strategically designed group of service centers could have been formed to accomplish the alleged goal. Finally, the district court noted that Champagne failed to support its theory with any evidence, particularly given the fact that the court had previously excluded Champagne's economic expert's report and testimony. Considering all of this, the district court concluded that there was "uncontroverted evidence that the benefits of collusion in this instance are outweighed by the risks" and thus Champagne's theory did not make economic sense.

We disagree with the district court. The gravamen of Champagne's theory is that the Established Distributors acted together to attempt to keep a new, aggressive entrant out of the market. There are several reasons why such behavior would be economically rational. For example, the established market participants could fear that an additional competitor would erode the profit margin available to the service centers. Or the established market participants

---

[12](...continued)
Exclusionary conduct, on the other hand, is conduct ultimately designed to achieve that same goal, but it aims to do so by excluding competitors from the market.").

might fear losing market share to the new market entrant, particularly an aggressive new entrant like Champagne. As one commentator has observed, "[w]here the 'victim' [of an exclusionary group boycott] is a competitor of the alleged conspirators, there is no mystery as to why the defendants would want to injure the rival. It is axiomatic that firms prefer to have fewer rather than more rivals." Glazer, supra, at 14.

Such is the case here. Champagne introduced evidence that the Established Distributors saw Champagne as a price-cutting competitor who threatened their market share and profit margins.[13] For example, an Integris official complained to Commonwealth that, because of Champagne's entrance and Commonwealth's recognition of Champagne as a distributor, "prices had come down in the marketplace" and "there wasn't nearly the profit level there used to be." Similarly, there were complaints that Champagne "sold things too cheap" and that "adding another distributor would dilute market share, dilute market pricing." One service center felt that "Champagne Metals' activities in the marketplace were going to be detrimental to the industry as a whole" and that "the price that Champagne Metals would take to the marketplace would be such that margins as a

---

[13] The Established Distributors argue that, because Champagne alleges the boycott began as soon as it entered the market, there was no point at which it could have developed a reputation as an aggressive, price-cutting competitor. However, Champagne's founder had a long-standing relationship with many customers due to his previous employment by one of the Established Distributors. Moreover, the Established Distributors' own statements demonstrate that they viewed Champagne as such a competitor.

whole for everyone that needed to compete at that price would compress to such a price that it would be . . . impossible to compete and still make a profit."

Simply put, Champagne's theory makes sense—it is certainly economically rational for a group of established firms to attempt to keep an aggressive competitor out of the market, whether they are doing so to protect profits or simply to guard market share. In light of this, the district court erred in drawing such limited inferences from Champagne's circumstantial evidence.[14]

[14] The Established Distributors make much of the fact that Champagne's own economic expert seems to have admitted that a boycott would be economically irrational without a corollary price-fixing agreement. In the expert's deposition, the following exchange occurred:

> Q. If you assumed hypothetically that some of the defendants got together and kept some mills from supplying some service centers, say Mike Champagne and two of his friends, and maybe stopped some entry hypothetically, given these markets with hundreds of service centers . . . [and the] competitive pricing in both purchasing and selling, absent collusion on price, they're never going to achieve any sustained benefit from such actions, correct?
>
> A. If you apply a, which I think you are, a strict theoretical microeconomic interpretation of competition in relationships to market, then that's – that would be a correct conclusion.

We first note that the district court excluded Champagne's expert's report and testimony—a ruling which we affirmed. Given this, the value of any argument based on this deposition testimony is little to none. Moreover, we refuse to be bound by such a "strict theoretical microeconomic interpretation" of competition. "[N]o real-world market is ever perfectly competitive." Alan J. Daskin & Lawrence Wu, Observations on the Multiple Dimensions of Market Power, 19 Antitrust 53, 54 (Summer 2005). Moreover, the Established Distributors' own statements indicate that they thought there were profits to be protected by the exclusion of Champagne. While we acknowledge that antitrust law is strongly

(continued...)

\* \* \* \* \*

Champagne's direct evidence of an agreement among the Established Distributors, combined with the district court's undue devaluation of the inferences to be drawn from Champagne's circumstantial evidence, compels us to conclude that the district court erred in granting summary judgment for the Established Distributors. However, particularly given our earlier conclusion that the district court may have erred in excluding the statements of mill representatives (statements which Champagne contends are additional circumstantial evidence of concerted action among the Established Distributors), we will not undertake to evaluate the circumstantial evidence and draw inferences ourselves. We therefore leave it to the district court to determine, on remand, whether the circumstantial evidence, viewed through the lens of a highly plausible economic theory, and combined with Champagne's direct evidence, creates a genuine issue of material fact as to the existence of a conspiracy.

## B.  Statute of Limitations

As an alternative ground for affirming the district court's grant of summary judgment, the Established Distributors argue that Champagne's antitrust claims were brought outside of the applicable statute of limitations and are thus time

---

[14](...continued)
premised on economic theory, common sense still has a role.

barred. The district court did not address the Established Distributors' statute of limitations defense in granting their motions for summary judgment. However, "'we have discretion to affirm on any ground adequately supported by the record,' so long as the parties have had a fair opportunity to address that ground." Maldonado v. City of Altus, 433 F.3d 1294, 1302-03 (10th Cir. 2006) (quoting Elkins v. Comfort, 392 F.3d 1159, 1162 (10th Cir. 2004)). Thus, we will address this alternative claim for affirmance advanced by the Established Distributors.

In general, "[t]he statute of limitations for federal antitrust actions is four years." Kaw Valley Elec. Coop. Co. v. Kan. Elec. Power Coop., Inc., 872 F.2d 931, 933 (10th Cir. 1989) (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971)); see also 15 U.S.C. § 15b. However, courts have recognized a "continuing conspiracy" exception to this rule:

> "[i]n the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act." . . . The exception thus has two requirements that are not entirely consistent: the acts in question must be distinct from the acts outside the limitations period, but they must continue the same conspiracy.

Kaw Valley, 872 F.2d at 933 (quoting Zenith Radio, 401 U.S. at 338). In other words, for an act to trigger the exception: "'1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new

and accumulating injury on the plaintiff.'" Id. (quoting Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 238 (9th Cir.1987)).

Champagne claims that the group boycott began in 1996, as soon as Champagne entered the market. Champagne did not file suit until April 2002—well outside the four-year limitations period. Thus, unless the "continuing conspiracy" exception applies, Champagne's federal antitrust claims are barred by the statute of limitations.

The Established Distributors argue that Champagne cannot invoke the exception because the exception only applies where there was an overt act that was more than a mere reaffirmation of a previous act occurring outside of the limitations period. They assert that the alleged agreement in 1996 to pressure the mills not to sell to Champagne was the critical act, and that any alleged action by the Established Distributors after that was merely a reaffirmation of that previous agreement. Citing our decision in Kaw Valley, they claim that even if Champagne's ongoing efforts to deal with mills were rebuffed during the four years prior to it filing suit, such action would not restart the limitations period.[15]

---

[15] The Established Distributors also argue that Champagne's own evidence shows it was not injured from any overt act occurring within the limitations period, and thus recovery under the continuing conspiracy exception is inappropriate. See Kaw Valley, 872 F.2d at 933 (noting that new act "must inflict new and accumulating injury on the plaintiff") (quotation omitted). However, Champagne's damages expert based his damages calculations on, inter alia, the higher price paid by Champagne for aluminum because of its inability to buy from all significant domestic mills, Champagne's lack of access to Ormet's products,

(continued...)

- 29 -

The Established Distributors' reliance on <u>Kaw Valley</u> is misplaced. In <u>Kaw Valley</u>, the alleged anticompetitive behavior stemmed from a decision by an electric cooperative not to supply power to non-members—a decision that occurred outside of the limitations period. <u>See</u> 872 F.2d at 933. We considered whether subsequent events, such as the cooperative's offer to supply a small amount of power to the plaintiff in an effort to avert a lawsuit and the plaintiff's demand for a share of the cooperative's power (made within the limitations period), were sufficient to restart the limitations period under the continuing conspiracy exception. <u>See</u> <u>id.</u> at 932, 933. We noted that whether the continuing conspiracy exception applied in that case depended on whether the initial decision was "final"; if it was, "no new cause of action is created when the victim makes subsequent futile efforts to deal with the [antitrust] violator and is rebuffed." <u>See</u> <u>id.</u> at 933-34. Finding that the initial decision "was final and took place outside the limitations period," we held that the plaintiff's antitrust claims were time barred. <u>Id.</u> at 935.

_____

(...continued)
and the loss of pricing advantage because of Champagne's lack of multiple domestic mills. These injuries stemmed from the denial of recognition of Champagne by the mills—denials that Champagne alleges were prompted by the pressure put on the mills by the Established Distributors. Further, at least some of these denials occurred within the limitations period; for example, Ormet refused to recognize Champagne in 2002. Thus the Established Distributors are incorrect to say that Champagne's evidence shows it suffered no injury from acts within the limitations period.

The critical difference between the present case and Kaw Valley is the structure of the alleged anticompetitive conspiracy. See generally 8 Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulation 162-12 (2d ed. 2006) ("Whether an antitrust violation should be characterized as a single act or a continuing violation is best determined by considering the type of violation involved."). In Kaw Valley, the allegation was that members of the electric cooperative illegally decided not to supply power to any non-member. Thus, the agreeing parties had exclusive control over the input they sought to deny to the plaintiff; a decision not to supply that input required no further action. Subsequent rejections of non-members' requests for power were, in the oft-quoted word of the Fifth Circuit, "'the abatable but unabated inertial consequences'" of the initial, final agreement. Kaw Valley, 872 F.2d at 933 (quoting Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 517 F.2d 117, 128 (5th Cir. 1975)).

In the present case, the allegation is that the Established Distributors illegally decided to pressure third parties—the mills—not to supply aluminum to Champagne. Thus, here, the agreeing parties' initial decision did require further action. The subsequent actions (contacting and pressuring the mills when those mills were considering recognizing Champagne) were both "distinct from the act[] outside the limitations period" (the agreement to effect a boycott) and a "continu[ation] [of] the same conspiracy." Id. The Established Distributors did not simply sit back and watch as the "unabated inertial consequences" of their

- 31 -

(alleged) anticompetitive agreement harmed Champagne, id. (quotation omitted); rather, their actions within the limitations period "manifest[ed] a commitment to renewing" and enforcing that agreement, II Areeda & Hovenkamp 210.

This difference makes the present case more analogous to the Ninth Circuit's decision in Hennegan v. Pacifico Creative Services, Inc., 787 F.2d 1299 (9th Cir. 1986). There, the Hennegans, souvenir shop owners, alleged that other souvenir shops and tour guide operators conspired to divert tourists from their shop to other souvenir shops. Id. at 1300-01. The Hennegans argued that, although the initial anticompetitive acts took place outside the limitations period, the defendants committed overt acts (such as payments by the other shop owners to the tour operators) within the limitations period and thus the continuing conspiracy exception should apply. Id. The court of appeals agreed. It distinguished its prior decision in AMF, Inc. v. Gen. Motors Corp. (In re Multidistrict Vehicle Air Pollution), 591 F.2d 68 (9th Cir. 1979), as a case where any injury to the plaintiff caused by the antitrust conspiracy "resulted from the [defendants'] 'irrevocable, immutable, permanent and final' decisions[] outside the limitations period." Hennegan, 787 F.2d at 1301 (quoting Air Pollution, 591 F.2d at 72). "[T]h[o]se initial decisions made prior to the limitation period completely and permanently excluded [the plaintiff] from the market." Id. (emphasis added). In contrast, "[t]he alleged actions outside the limitations

period did not immediately and permanently destroy the Hennegans' business, nor were they 'irrevocable, immutable, permanent and final.'" Id.

As in Hennegan, the initial alleged decision to boycott Champagne did not—and could not—"immediately and permanently destroy" Champagne's business. Champagne did not seek aluminum from the Established Distributors but rather from the mills. The Established Distributors' initial boycott decision simply could not "completely and permanently exclude[]" Champagne from the market. Rather, the Established Distributors allegedly attempted to further their conspiracy by engaging in subsequent overt acts—i.e., threatening and pressuring those mills that were considering recognizing Champagne. Therefore, the continuing conspiracy exception applies—the Established Distributors allegedly engaged in "new and independent act[s]" by threatening and pressuring the mills and these acts "inflict[ed] new and accumulating injury" on Champagne by causing it to be denied access to needed inputs. See Kaw Valley, 872 F.2d at 933.

In sum, Champagne's claims of antitrust violations occurring within the limitations period are not barred by the statute of limitations, and Champagne may seek to recover damages for those acts.[16] See id., 872 F.2d at 933 ("[I]n the

---

[16] In its brief to this court, Champagne only expressly points to one such act occurring within the limitations period—the alleged threats and pressure exerted on Ormet in early 2002, when Ormet "appeared to have nearly approved Champagne." On remand, the district court should determine in the first instance whether there are other overt acts for which Champagne seeks to recover—i.e., acts occurring during the limitations period.

- 33 -

context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act.") (quoting <u>Zenith Radio</u>, 401 U.S. at 338). <u>See</u> <u>generally</u> <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 189 (1997) ("[I]n the case of a 'continuing violation,' . . . each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again . . . . But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.") (citations, quotations omitted).[17]

---

[17] As an additional alternative ground for affirmance, the Established Distributors assert that Champagne's claim should be analyzed under the rule of reason (rather than as a per se claim) and that, under this approach, Champagne has failed to satisfy its burden of showing that the alleged conspiracy had any adverse effect on competition. <u>See</u> I ABA Section of Antitrust Law, <u>Antitrust Law Developments</u> 53 (4th ed. 1997) ("[U]nder the 'traditional' rule of reason, the plaintiff bears the initial burden of proving that an agreement has had or is likely to have a substantially adverse effect on competition."). The district court did not rule on this argument, and we find the appellate record insufficient to allow us to address this issue in the first instance. <u>See</u> <u>generally</u> <u>Diaz v. Farley</u>, 215 F.3d 1175, 1182-83 (10th Cir. 2000) (explaining that the determination of whether a group boycott claim is to be judged under a per se or rule of reason standard requires examination of whether defendants "possess market power or exclusive access to an essential element to effective competition" and whether there were "plausible arguments that [the challenged practices] were intended to enhance overall efficiency and make markets more competitive") (quotations omitted). We therefore decline to affirm the district court on this basis. <u>See</u> <u>Maldonado</u>, 433 F.3d at 1302-03 ("[W]e have discretion to affirm on any ground <u>adequately supported by the record</u>.") (emphasis added). This issue may be explored further on remand.

### III. State Law Antitrust Claim

After granting summary judgment on the federal antitrust claim for lack of evidence of a conspiracy, the district court considered Champagne's claim that the Established Distributors' conduct violated the § 203(A) of the Oklahoma Antitrust Act.[18] Correctly explaining that, unlike the federal antitrust statute, the state statute reaches purely unilateral acts that unreasonably restrain trade, see Green Country Food Mkt., Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1280 (10th Cir. 2004); Harolds Stores, Inc. v. Dillard Dept. Stores, Inc., 82 F.3d 1533, 1550 (10th Cir. 1996), the district court ruled that the lack of evidence of a conspiracy did not preclude state antitrust liability. Even so, the district court ultimately granted summary judgment for the Established Distributors, finding "no evidence that th[e] individual acts harmed competition." (Emphasis added).

Our earlier conclusion that Champagne might be able to survive summary judgment on its federal antitrust claim leads us to reverse, in part, the district court's ruling on Champagne's state antitrust claim as well. See generally Oakridge Invs., Inc. v. S. Energy Homes, Inc., 719 P.2d 848, 850 (Okla. Civ. App. 1986) ("The Oklahoma antitrust statutes are similar to federal antitrust

---

[18] Section 203(A) provides that

[e]very act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal.

79 Okla. Stat. Ann. § 203(A).

legislation."). On remand, the district court should consider whether the evidence is sufficient to allow this claim to go to the jury on a collective action theory. However, we agree with the district court's decision that the Established Distributors are entitled to summary judgment on Champagne's unilateral action theory; we therefore affirm the district court's ruling on this ground.

On appeal, Champagne makes three arguments in support of its claim that the district court erred by granting summary judgment as to its unilateral action theory: (1) the court erroneously reached the issue without adequate briefing; (2) the state law claim should have been subjected to per se treatment and thus harm to competition was irrelevant; and (3) even assuming harm to competition was relevant, the evidence in this case is stronger than that in Harolds Stores, in which we upheld the jury's verdict because, inter alia, there was evidence of unilateral action that injured competition and unreasonably restrained trade. We consider these issues in turn.

First, Champagne argues that the only issue presented to the district court in support of the Established Distributors' motion for summary judgment on the state antitrust claim was that a ruling in their favor on the federal claim ipso facto compelled a ruling in their favor on the state claim. In other words, Champagne claims that the district court erred in reaching an issue (whether there was injury to competition from unilateral conduct) that was not adequately briefed. The Established Distributors dispute this characterization of the record,

and respond that the issue of injury to competition was briefed as relevant to both the federal and state antitrust claims. Regardless of the state of the record, however, we decline to find for Champagne on this ground, as Champagne makes no real argument (other than conclusory statements that the district court erred) and cites no legal authority in support of its position. See, e.g., Rios v. Ziglar, 398 F.3d 1201, 1206 n.3 (10th Cir. 2005) ("To make a sufficient argument on appeal, a party must advance a reasoned argument concerning each ground of the appeal, and it must support its argument with legal authority.") (citation omitted).

Champagne next argues that, because the state and federal antitrust laws are generally treated similarly, the district court should have subjected its state unilateral action claim to per se treatment and forgone its inquiry into whether these unilateral acts harmed competition. See I ABA Section of Antitrust Law, Antitrust Law Developments 43 (4th ed. 1997) ("Under the per se rule, a restraint is conclusively presumed unreasonable without elaborate inquiry as to the precise harm it has caused . . . .") (quotations, alterations omitted). However, even assuming Champagne's collective action claim merits per se treatment,[19] Champagne points to no case that suggests that unilateral conduct intended to exclude a competitor is properly placed in this category.[20] As "applying a per se

_____

[19] As noted earlier, we do not decide this issue today.

[20] The federal cases to which Champagne cites are inapposite—as the district court correctly noted, Section 1 of the Sherman Act simply does not reach

(continued...)

- 37 -

rule to particular conduct risks sweeping potentially procompetitive activity within a general condemnation and prohibits a defendant from justifying its conduct," courts are (and should be) wary of departing from the rule-of-reason standard without "demonstrable economic effect." Id. at 46. We are not prepared to determine that the Oklahoma Supreme Court would hold this unilateral conduct to be a per se violation absent some guidance from that Court.

Finally, Champagne claims that, even if injury to competition is relevant, it put forth sufficient evidence of anticompetitive effect stemming from the unilateral actions of each Established Distributor. Specifically, Champagne compares its evidence with the plaintiff's evidence in Harolds Stores. In that case, the plaintiff's economist provided evidence that the defendant "adversely impacted competition in general and unreasonably restrained trade." 82 F.3d at 1549. Specifically, the economist testified that the defendant's illegal infringement on the plaintiff's copyrights

> d[id]n't just do damage to [the plaintiff], it sen[t] a signal to anybody else that wants to enter this market, that if you come in here, you're going to get squashed because this big company will exercise its power and take your copyrights. In that regard, in economics, we would say it raise[d] a barrier to entry. That itself is anti-competitive. That, in my judgment, is an unreasonable restraint of trade.

Id. (quotation, original alterations and emphasis omitted).

---

(...continued)
unilateral conduct in restraint of trade.

Champagne argues that, as in Harolds Stores, the harm to competition in the present case is the barrier to entry that the actions of each Established Distributor (i.e., the threats against the mills) erected. Specifically, Champagne points to three pieces of evidence that it contends demonstrates harm to competition: (1) evidence that the Established Distributors were significant mill customers; (2) evidence that there has been very little entry into the aluminum service center market over the last twenty years; and (3) evidence that Champagne has not been able to compete on the same terms as the Established Distributors due to its inability to attain mill recognition. The glaring difference between this case and Harolds Stores, however, is that, here, Champagne points to no evidence of an actual barrier to entry created by the Established Distributors' unilateral conduct. The Established Distributors presented an economic expert who testified that there were no significant barriers to entry in the aluminum service center industry, and that any lack of entry stems from the industry's poor economic performance. On appeal, Champagne points to no evidence to counter this testimony. Thus, the evidence before us shows, at most, that (1) the Established Distributors individually have "clout" with the mills such that they could convince the mills to accede to threats not to sell to new entrants, (2) very few new service centers have entered the industry over the past twenty years, and (3) this lack of entry was due to the industry's lackluster performance. However, to show a unilateral unreasonable restraint of trade in violation of § 203(A), a

plaintiff must show a barrier to entry—or some other harm to competition—caused by the defendant.  See Harolds Stores, 82 F.3d at 1548. Without such evidence, Champagne has not shown that the unilateral conduct of the Established Distributors constituted an unreasonable restraint of trade.[21]

## IV.  State Law Tortious Interference Claim

Champagne also alleged that the Established Distributors tortiously interfered with its relationships with the mills.  To prove a claim of tortious interference with business relations, one must show (1) a business or contractual right that was interfered with, (2) interference that was malicious and wrongful and was neither justified, privileged nor excusable, and (3) damage caused by interference.  Brown v. State Farm Fire and Cas. Co., 58 P.3d 217, 223 (Okla. Civ. App. 2002).  The district court found that the alleged acts of interference that

---

[21] As noted, the evidence of the barrier to entry/injury to competition in Harolds Stores was the testimony of the plaintiff's economic expert.  82 F.3d at 1549.  Champagne's economic expert did state that the threats by the Established Distributors "[are] a deterrent to any other investors contemplating entry into the service center business in the relevant market."  However, the district court excluded this evidence and we affirmed, thus the testimony is not part of the record.  We do not mean to imply that there might not be other evidence of injury to competition to be found in this case's voluminous record; we note only that Champagne fails to point to any such evidence on appeal.

fell within the two-year statute of limitations period[22] were directed at

Champagne's relationship with only two mills—Ormet and Commonwealth.[23]

### A. Interference With Champagne's Relationship With Ormet

Turning first to the alleged interference between Champagne and Ormet,

the district court noted that, as no business relationship yet existed between the

two, Champagne's claim of interference with business relations was more

properly a claim of interference with prospective business advantage.[24]  The

district court then ruled that there was no evidence of improper interference and

---

[22] On appeal, the Established Distributors argue that Champagne's tortious interference claims are barred by the two-year statute of limitations because Champagne knew of the Established Distributors' conduct in 1996—six years prior to its bringing suit.   The district court explained that recovery was permissible for each tortious act occurring inside of the limitations period—that is, after April 22, 2000.  The Established Distributors provide no support for their claim that Champagne was required to bring its claim within two years of the first act or lose the ability to sue for any subsequent act, thus we will not consider the argument.  See Eateries, Inc., 346 F.3d at 1232 ("A party forfeits an issue it does not support with legal authority or argument.") (quotations omitted).

[23] Champagne does not challenge this ruling on appeal.  Further, the district court ruled that, as none of the alleged acts within the limitations period involved defendant Earle M. Jorgensen Co., summary judgment in Jorgensen's favor was appropriate.  Champagne does not challenge this ruling on appeal; we therefore affirm summary judgment for Jorgensen on the tortious interference claim.

[24] Interference with prospective economic advantage requires a party to show (1) the existence of a valid business relation or expectancy, (2) knowledge of the relationship or expectancy by the defendant(s), (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.  Boyle Servs., Inc. v. Dewberry Design Group, Inc., 24 P.3d 878, 880 (Okla. Civ. App. 2001).

that, even if there was, there was nothing to suggest that the interference was wrongful because "[i]f [Champagne] cannot demonstrate that [the Established Distributors'] actions rise to an unreasonable restraint of trade, as a matter of law, it cannot" succeed on its tortious interference claim.

On appeal, Champagne argues that it did not need to separately plead interference with prospective business advantage, because this tort is "encompassed" within the tort of interference with business relations. This is incorrect. See Overbeck v. Quaker Life Ins. Co., 757 P.2d 846, 847-48 (Okla. Civ. App. 1984) ("Appellant argues that interference with a prospective economic advantage is synonymus [sic] with interference with contractual or business relations. This comparison is not entirely accurate. Although both torts do have similarities, the underlying theories of liability differ . . . . We believe the subtle differences between tortious interference with a prospective economic advantage and tortious interference with a contractual or business relation is more than just a semantical one, and thus we decline to treat the two synonymously . . . ."); see also Gaylord Entm't Co. v. Thompson, 958 P.2d 128, 150 n.96 (Okla. 1998) (noting that there is a "difference between interference with a prospective economic advantage and with contractual or business relations").[25] We therefore

_____

[25] Champagne argues that the two claims are interrelated because interference with an existing business relationship might cause damage in the form of the loss of a prospective economic advantage. Be this as it may, the district court's ruling had nothing to do with damages; rather, the court focused

(continued...)

restrict Champagne to its pleadings and consider only whether the district court erred in granting summary judgment on Champagne's interference with business relations claim. As noted, the district court rejected this claim because it found Champagne failed to establish that it had any right to a relationship with Ormet—a critical element of the claim. See Brown, 58 P.3d at 223. On appeal, Champagne does not present any argument that this ruling was wrong; we therefore affirm the district court's disposition of this claim.

**B. Interference With Champagne's Relationship With Commonwealth**

As the Established Distributors acknowledge, Champagne does have a business relationship with Commonwealth. The district court granted summary judgment for the Established Distributors on this claim based on its conclusions that there was no evidence of any wrongful conduct in the form of an unreasonable restraint of trade and any "interference" was protected by the competitors privilege. Our reversal of the district court's decisions on Champagne's federal and state antitrust claims compels a reversal of this claim as well; if Champagne can show evidence of anticompetitive conduct, it can, by definition, show wrongful conduct in support of its interference with business relations claim. Cf. Krebsbach v. Henley, 725 P.2d 852, 856-59 (Okla. 1986) (discussing whether defendants unlawfully and wrongfully interfered with

---

[25](...continued)
on the fact that Champagne had shown no existing relationship with Ormet.

plaintiff's business relations by looking at whether defendants violated federal or state antitrust law and concluding that "[a]s the evidence fails to support an inference that appellees' actions constituted an unlawful restraint of trade, it also fails to support any other inference which would establish that their actions in refusing to work in conjunction with appellant were in any way wrongful"). We therefore remand this claim for further consideration.[26]

## V. Copying and Imaging Costs

Finally, Champagne appeals the district court's award of costs and imaging fees to the Established Distributors. The district court awarded costs pursuant to Fed. R. Civ. P. 54(d), which provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." (Emphasis added.) Because we are remanding this case for further proceedings, the "prevailing party" has yet to be established, and thus we necessarily must vacate the district court's award of costs.[27]

---

[26] Champagne argues that, by stating that only conduct that amounted to an unreasonable restraint of trade could support a showing of tortious interference, the district court imposed an "excessively narrow reading" of what acts could be lawful within the meaning of a tortious interference claim. However, any narrowing of what acts might qualify as "wrongful" was done by Champagne, not the district court—in its motion for summary judgment, Champagne specifically argued that "the [Established Distributors'] illegal acts in restraint of trade . . . are wrongful and, thus, sufficiently malicious to support Plaintiff's claims for tortious interference." The district court did not err by restricting its analysis to the theory advanced by Champagne.

[27] We leave any further consideration of the award of costs to the district

(continued...)

## CONCLUSION

To summarize, we hold the following: (1) the exclusion of Champagne's economic expert was not erroneous; (2) the process by which the district court analyzed whether certain statements of mill representatives were hearsay was flawed; on remand, the district court should determine if the statements are admissible as co-conspirator statements; (3) there was some direct evidence of an agreement among the Established Distributors and the conspiracy posited by Champagne was economically plausible; on remand, the district court should consider whether Champagne's direct and circumstantial evidence of an agreement is sufficient to survive summary judgment; (4) Champagne may be able to make out a claim of violation of the Oklahoma antitrust act based on a collective action theory, but the grant of summary judgment as to any unilateral action violating the state act was not erroneous; and (5) Champagne's state law claim of tortious interference was rightly rejected as to Ormet, but may be proper as to Commonwealth. We therefore AFFIRM the district court's order excluding Champagne's expert; AFFIRM in part and REVERSE in part the district court's grant of summary judgment in favor of defendants; VACATE the district court's award of costs; and REMAND for further proceedings consistent with this decision.

_____

(...continued)
court on remand.